**SCHLEIER LAW OFFICES, P.C.**
4600 East Shea Boulevard, Suite 208
Phoenix, Arizona 85028
Telephone:  (602) 277-0157
Facsimile:  (602) 654-3790
TOD F. SCHLEIER, ESQ.  #004612
tod@schleierlaw.com
BRADLEY H. SCHLEIER, ESQ.  #011696
brad@schleierlaw.com

Attorneys for Plaintiff Kathleen Hanrahan

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Kathleen Hanrahan, a married woman, | Case No.: |
| Plaintiff, | **COMPLAINT** |
| vs. | **(JURY TRIAL DEMANDED)** |
| AMMO, Inc., a Delaware corporation; Fred Wagenhals and Heather Wagenhals, husband and wife, | |
| Defendants. | |

Plaintiff Kathleen Hanrahan, by and through counsel, alleges as follows:

**JURISDICTION AND VENUE**

1.    This action arises under the whistleblower protection provisions of the Sarbanes-Oxley Act, 18 U.S.C. §1514A *et seq*. and the whistleblower protection provisions of the Dodd-Frank Act, 15 U.S.C. §17u-6 *et seq*. Jurisdiction is invoked pursuant to 28 U.S.C. § 1331, as well as under 28 U.S.C. § 1343(a)(4), and 28 U.S.C. §§ 2201 and 2202. This suit is authorized and instituted pursuant to the above federal

statutes. The jurisdiction of this Court is invoked to secure protection of and to redress deprivation of rights secured by the Sarbanes-Oxley Act and the Dodd-Frank Act.

2.      Venue is proper under 28 U.S.C. § 1391 because Defendants' principal place of business is in this district. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## **PARTIES**

3.      Plaintiff Kathleen Hanrahan is a married woman and resides in Maricopa County, Arizona. Plaintiff was President of the Global Tactical Defense Division of Defendant AMMO since March 2018, and a member of Defendant AMMO's Board of Directors since November of 2017.  For nearly 15 years (1996 – 2010), prior to her engagement with Defendant, Plaintiff was an executive for TASER International, Inc. (now AXON).  During her tenure in their "C" Suite (serving as the CFO, COO and President), TASER transitioned from a privately held, family-run company generating $2.0 million in sales, to a publicly traded organization on the NASDAQ Stock Exchange, reporting more than $100 million in annual revenue with significant gross margins.  Since leaving TASER in 2010, she has served as a consultant, interim executive and advisor/director for a number of private and publicly traded organizations in vastly different industries, including the financial services, consumer products, and the security and defense markets.

4.      Defendant AMMO, Inc. is a publicly traded Delaware corporation doing business in the State of Arizona.  It has corporate headquarters at 7681 East Gray Road, Scottsdale, Arizona   85260. It represents itself on its website as "a leading vertically

integrated producer of high-performance ammunition and components and operator of GunBroker.com, the largest online marketplace serving the firearms and shooting sports industries".

5.     Defendants Fred Wagenhals and Heather Wagenhals are husband and wife and reside in Maricopa County, Arizona.  At all times mentioned herein, Defendant Fred Wagenhals was the Chief Executive Officer and Chairman of the Board of Defendant AMMO, and Plaintiff's supervisor.  All acts of Defendant Fred Wagenhals were done for and on behalf of his marital community and within the course and scope of his employment as AMMO's Chief Executive Officer.

6.     This Complaint also concerns the actions of various members of Defendant AMMO's executive management team.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.     Plaintiff timely filed complaints with the United States Department of Labor, Occupational Safety and Health Administration in August 2019.  After a 2.5 year investigation, on February 7, 2021, the Secretary issued the following findings:

> "As a result of the investigation, OSHA has determined that reasonable cause exists to believe that a violation of SOX occurred. Specifically, after evaluating all of the evidence provided by the employer and the Complainant, OSHA finds reasonable cause to believe that Complainant's protected activity was a contributing factor in the adverse action. Complainant established that she engaged in a protected activity by complaining to Respondent's CEO on February 1, 2019 her concerns about stock transactions that violated SEC rules and by emailing multiple SOX-related complaints to the CEO on May 19, 2019; that Respondent took an adverse action against Complainant when, at the CEO's request, shareholders removed Complainant from its BOD on May 23, 2019; that the employer was aware of the Complainant's protected activity; and that a

causal link existed between Complainant's protected activity and the adverse employment action because of the close proximity in time between Complainant's protected activity and her removal from the BOD. However, Complainant's claim of constructive discharge was not supported by the evidence and testimony available. Respondent's stated reason for removing Complainant from the BOD appears pretextual and not genuine. Respondent did not meet its burden to justify the adverse action for a non-discriminatory reason."

As noted, the Secretary's findings were in the Plaintiff's favor, acknowledging SOX violations occurred, and that Plaintiff was engaged in protected activity, and as a result suffered adverse employment action in relation to her Board position and ordered reinstatement and awarded lost compensation, as well as compensatory damages.  More than 180 days have elapsed since filing the complaint with DOL and OSHA. Plaintiff has therefore exhausted her administrative remedies.

## FACTUAL BACKGROUND

**A.     Plaintiff Learns About Defendant AMMO's Improper Corporate Formation and Inappropriate Stock Transaction by AMMO Executives and Notifies Defendant Wagenhals of Her Discovery.**

8.     In early August 2018, Plaintiff learned about serious concerns relating to the corporate formation of Respondent AMMO.  In connection with these concerns, on August 8, 2018, Chris Besing, former Audit Committee Chairman, provided Plaintiff with a copy of a lawsuit filed by the SEC in the United States District Court, Southern District of California against AMMO's prior SEC Counsel, Luke Zouvas, and Christopher D.  Larson, AMMO's Vice President of Finance. The SEC lawsuit alleged that Mr. Zouvas and Mr. Larson engaged in a "pump-and-dump" scheme to manipulate

the market for the stock of Crown Dynamics, Corp, a microcap company also listed on the over-the counter ("OTC") Markets.[1]

9.      For the next ninety days, AMMO and its counsel worked extensively with Complainant to prepare a series of filing and corrections with the States of Delaware, California, Arizona and the SEC related to the original mergers constructed to transition AMMO into a publicly traded entity authorized to sell shares of its stock on the open market.  This included the final merger/acquisition of the ammunition operation known as AMMO Inc. by Retrospettiva, the public shell.  According to Defendant Wagenhals, the prior corporate paperwork had all been prepared by Mr. Zouvas, along with Mr. Larson and Jay Grdina, AMMO's then Chief Marketing Officer.  Defendant Wagenhals, Mr. Larson and Mr. Grdina were the Founders of AMMO, Inc. and three of the largest shareholders in the Company.

10.     From August until mid-September 2018 the corporate documents associated with the three corporations used to form AMMO, Inc. were reviewed and revised.   This included significant changes to the affected corporations' Articles of

---

[1] On June 1, 2020, the U.S. District Court for the District of Arizona entered final consent judgments against Luke C. Zouvas, Christopher D. Larson and Cameron F. Robb for their roles in an alleged fraudulent stock promotion scheme. Without admitting or denying the allegations, Larson and Robb consented to the final judgments, which permanently enjoin them from violating the antifraud provisions of Section 17(a) of the Securities Act of 1933, and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. In addition, the court ordered Larson and Robb to pay disgorgement and prejudgment interest, jointly and severally, of $320,672, and ordered each to pay a civil penalty of $75,000. The Court also imposed five-year conduct-based injunctions and officer and director bars against them. Separately, on June 3, 2020, Larson agreed to be permanently suspended from appearing and practicing before the  SEC as an accountant, which includes not participating in the financial reporting or audits of public companies.

Incorporation and Bylaws, to correct formation errors, which required both Board and shareholder approval to execute.  In lieu of a formal shareholder meeting to obtain approval of the Articles and Bylaws, the Company elected to use a written shareholder consent, that could be delivered to solicit the requisite votes.

11.     In preparation, Plaintiff requested a current listing of shareholders from Ron Shostack, AMMO's then Chief Financial Officer, and was provided an Excel spreadsheet which included what was supposed to be AMMO's most recent capitalization table and shareholder list. To ensure passage of the consent action, Defendant Wagenhals identified sufficient shareholders to meet the 51% threshold required under Delaware law.  He, Tod Wagenhals, and Chris Larson then began calling and discussing the modifications with individuals they believed would approve the required actions, a practice later utilized to remove Plaintiff from her position on the Board of Directors. This list included the shares held by Messrs. Larson, Wagenhals and Grdina.  Each founder (Messrs. Larson, Wagenhals and Grdina) voted several ballots to account for the list of entities in which they claimed ownership over, and AMMO believed their shares were held. (These numbers tied to the original share count issued to each).

12.     It was not until Plaintiff was preparing the final exhibit detailing the stock sales by Mr. Larson and Mr. Grdina to support her case, that she discovered all three founders voted shares in late 2018 they no longer owned or had control over at the time their ballots were cast. Plaintiff noted this as a significant deficiency in the Company's internal controls over financial reporting. Industry best practice requires that all insider sales and transactions be properly documented, with notice provided to the Chief

Financial Officer before the sale transacts to ensure compliance as well as the completion of requisite Section 16 paperwork and filings.  This practice enables the CFO to update all stock ledgers and cap tables for insider holdings, and to ensure the proper filings are prepared and submitted to the SEC.

13.     Unfortunately, because neither Mr. Larson or Mr. Grdina notified the CFO of their sales throughout 2018, and because Mr. Larson with the assistance of Mr. Dominic Daddio, coordinated all related activity with the stock transfer agent directly during this time period, the CFO and Company were unaware Messrs. Larson, Grdina and others no longer held title to the shares sold, or that the Company's stock ledgers were inaccurate. The same was true for the shares Defendant Wagenhals gifted to several individuals, including Plaintiff, in 2018. All three founders failed to notify the CFO, or publicly report their stock sales and/or transfers as is required by the SEC for all Section 16 officers.

14.     In fact, it was not until March 11, 2020, six months after Plaintiff filed her initial Complaint with the United States Department of Labor, and more than 2 years after the insider stock sales began, that the Company and the executives finally began to disclose stock transactions.  None of these filing included the sale of shares or transfers made by the three Founders during Plaintiff's employment, and several significant sales of shares occurred during both quiet and blackout periods for the corporation.

15.     As founders, and key members of Executive Management, as well as the three largest stockholders, Plaintiff had a good faith belief all of these individuals were subject to the regulations governing Section 16 officers with respect to publicly

disclosing the issuance, transfer and sale of the Respondent AMMO's securities due to their significant executive leadership roles within the company and their access to privileged insider information.  As former public company executives subject to Section 16 reporting, both Defendant Wagenhals and Mr. Larson (already under investigation by the SEC) knew failure to report insider transactions were violations of SEC regulations.

16.     On October 8, 2018, Chris Besing, the Audit Committee Chair (May 2018 – October 2018), asked for clarification on stock transactions he found when reviewing the transfer agent logs and Company documentation.  Specifically, Mr. Besing wanted specific details pertaining to an unusually large stock grant issuance (500,000 shares) to Ricky Mooroian, now deceased, who was then contracted for IT Services, and in 2018 hired as the Head of IT.  In response, Mr. Besing was provided a vague disclosure from Mr. Larson that was inconsistent with prior SEC filings and did not align with other employee or contractor grants issued for more substantial services. Subsequently, on October 10, 2018, Chris Besing resigned from AMMO's Board of Directors after meeting with SEC counsel Jon Cohen and Plaintiff, and subsequently called Plaintiff stating there was too much risk, given Mr. Larson and Mr. Grdina's involvement in AMMO, Inc and the lack of sufficient internal controls.

17.     On or about November 8, 2018, Defendant Wagenhals expressed concern to Plaintiff because he believed Mr. Grdina was selling shares of AMMO stock while at the same time was out raising capital through private offerings and presenting to potential investors.  Defendant Wagenhals became aware of this fact after Terry Dean, an outside sales representative for AMMO, contacted Defendant Wagenhals and indicated that Mr.

Grdina approached him to sell shares of his stock stating he needed the cash. Mr. Dean called Defendant Wagenhals to inquire whether he knew Mr. Grdina was selling AMMO stock and to make sure there was not an issue with potential insider sales transactions.

18. Defendant Wagenhals asked Plaintiff if there was a way to know if Mr. Grdina had sold any of his AMMO shares and Plaintiff told him the Stock Transfer agent records would detail any and all transactions. Defendant Wagenhals asked Plaintiff to review the information and advise him as to whether Mr. Grdina had in fact sold shares to anyone, and to inform him how many of his shares were disposed of. Defendant Wagenhals stated both Mr. Grdina and Mr. Larson had repeatedly told him they had never sold any of their stock.

19. On November 8, 2018, Plaintiff had the transfer records pulled and sent to her. She created a spreadsheet of all Mr. Grdina's transactions to include the date of transaction, the number of shares sold/transferred, the market price range for the date of sale, and a running tally of his position. During her review, Plaintiff discovered a significant number of shares were also sold by Chris Larson, Dominic Daddio, Human Resources (who oversaw stock transactions and wires), as well as Ricky Mooroian, the employee flagged by the former Audit Committee Chair. Because both Mr. Larson and Mr. Grdina were the founders and AMMO executives, Plaintiff had a good faith belief they were also Section 16 sales subject to public disclosure. Plaintiff's internal investigation focused on Mr. Larson and Mr. Grdina.

20. During her review of the transfer agent logs, Plaintiff also discovered that in late 2017 and again sometime in April or May of 2018, the trading restrictions of

nearly 3.0 million shares of stock held by insiders and individuals with inside knowledge of the Company's financial position had the stock restriction removed. This included more than a million shares of Mr. Larson's stock, as well as shares held by Messrs. Zouvas, Daddio, Mooroian, and a few others. This removal of the stock legend from insider shares allowed the shares to be freely traded in the open market, and no longer be subject to the same SEC Rule 144 paperwork required for all other shareholders of the Company's stock.

21.    Concerned with what she had found, Plaintiff reviewed the Board minutes and SEC filings to see if AMMO or its Board of Directors had ever approved of, or reported, this lifting of restriction under the Rule 144 exemption for a select group of employees and insiders. There was no record of its approval or disclosure to the Board, or the Audit Committee. In addition, Plaintiff verified that no Registration or public disclosure was filed disclosing the restriction removal to shareholders.[2]

22.    After reviewing the records, Plaintiff asked Defendant Wagenhals if he was aware that these shares no longer carried the restricted legend, typically removed under the Rule 144 exemption at the time of sale. Plaintiff expressed her concern that lifting of

---

[2] Rule 144 is a regulation enforced by the SEC under which restricted, unregistered and controlled securities can be sold or resold.) Rule 144 provides an exemption from registration requirements to sell the securities through public markets if a number of specific conditions are met. The regulation applies to all types of sellers, in addition to issuers of securities, underwriters and dealers. However, if the sellers are affiliates, or if the Issuer's stock trades on the "over the counter" exchanges (OTC) the restrictions for selling are much more comprehensive, to include the filing of a "notice to sell", and, actual sales of stock are limited based upon the average reported weekly trading volumes. AMMO, Inc. was, at the time listed on the OTC under the ticker symbol "POWW".

the restrictions was coordinated by employees without Board approval or public disclosure and further expressed her concern that this type of unregistered lifting of stock restrictions for insiders could result in SEC violations.  Defendant Wagenhals denied any knowledge of the registration lifting at this time. (It was later noted by Defendant Wagenhals in May 2019, he was aware of the restriction being lifted on certain insider shares in order for the Company to comply with the national stock exchange requirements for shares held in the public float).  As the Chairman of the Board, and CEO, Defendant Wagenhals by his own admission, acknowledges that he was fully aware this was done without the knowledge or consent of the Board, and was not properly approved by or disclosed to the shareholders of the Company putting the directors and officers at risk.

23.     Plaintiff questioned Defendant Wagenhals' response, and whether the action taken was permitted under SEC regulations. She also expressed her concern that the Company's shareholders could raise issues with this action based on the Company's failure to obtain approval on a pending Registration Statement filed on Forms S-1 and S-1/A registering more than 13.9 million shares sold to investors in a private offering. It was not until late 2019 that the Company filed an amended S-1/A to register the shares held by the original investors. This Registration Statement became "effective" on September 26, 2019, again years after insiders began trading in their shares of stock while at the same time selling new shares to investors through private offerings without properly disclosing their own insider transactions.

24.    On several occasions after learning of Mr. Grdina and Mr. Larson's stock sales, Defendant Wagenhals told Plaintiff and Tod Wagenhals, his son and Executive Vice President, Defendant Wagenhals felt betrayed by Mr. Larson and Mr. Grdina. Defendant Wagenhals commented they were his "partners", had committed not to sell, and acknowledged they both put the Company at risk by selling their shares and questioned their long-term commitment to him and the Company. Defendant Wagenhals also commented on several occasions that he held Mr. Larson personally accountable for all the errors in the corporate filings he believed occurred because Mr. Larson was under the influence of alcohol for most of 2017 and 2018.

25.    Defendant Wagenhals also regularly expressed his frustration with Mr. Larson being absent for more than six months (all paid leave) over the previous twelve months leaving him without financial leadership support.  Defendant Wagenhals stated he believed Mr. Larson's absences and errors had cost the Company hundreds of thousands of dollars in time, effort, legal bills as well as the lack of progress with uplisting AMMO Inc.'s stock to a national exchange. Defendant Wagenhals made this same statement to Plaintiff immediately following their trip to New York in April of 2019 described below. Defendant Wagenhals openly discussed his frustration with Mr. Larson's drinking and associated medical leaves of absence.  In fact, most if not all employees, and close affiliates of the Company were aware of Mr. Larson's condition, as a result of Defendant Wagenhals' discussions or witnessing Mr. Larson's behavior at the office, or at business events while under the influence.

26.     On or about December 1, 2018, Mr. Larson returned from a paid leave of absence (approximately 3 months).  During the leave of absence, Plaintiff was asked by Defendant Wagenhals to help cover Mr. Larson's functions within the Company and to support the newly promoted Chief Financial Officer, Robert Wiley.  During that time, Plaintiff took over investor calls, presentations and meetings, continued managing Board of Director meeting preparation, financial support of pending acquisitions, press releases, and helped to support daily operations, many of which she had helped or participated in the past.  All the while keeping Mr. Larson updated on the activity through email or via telephone conversations when permitted. This was in addition to fulfilling Plaintiff's existing role as the sales executive in charge of the law enforcement and military division for the Company and serving on the Board of Directors.

27.     This demonstrates Plaintiff's multiple responsibilities and Defendant Wagenhals' belief that she could not only successfully handle her specific responsibilities as the President of the Global Tactical Defense Division and Director, but also successfully assume those of another key executive. This further demonstrates the pretextual reason Defendant Wagenhals provided when he asked Plaintiff to resign from the Board of Directors. Her continued updates and email correspondence to Mr. Larson during his absence also conflicts with his statements that she was undermining him during his medical leaves of absence.

28.     On February 1, 2019, Plaintiff again pulled the stock transfer agent records to update the stock trading information being kept on both Mr. Larson and Mr. Grdina and ensure no further sales were transacted. After finding that both Mr. Larson and Mr.

Grdina continued to sell stock, Plaintiff notified Defendant Wagenhals and asked whether he knew Mr. Larson was selling shares.  Defendant Wagenhals said he was aware of the sales, and that Mr. Larson was selling shares to support his legal expenses, which were the result of his current case with the SEC.  All of which were conducted without proper public disclosure, and during black out or quiet periods when no Company employee should be selling shares of stock, which as a public company executive Defendant Wagenhals was well aware.

29.    After reviewing the transfer agent logs and witnessing trading software in use by Mr. Daddio and Mr. Larson, Plaintiff had a good faith belief that in addition to Mr. Larson and other members of management (specifically Messrs. Daddio and Mooroian) selling these shares for monetary gain, they were also trading shares between themselves to ensure the stock price remained at a certain level and had daily volume recorded in an effort to attract other investors. At this point in time, Mr. Grdina was no longer employed by Defendant AMMO, but based on his involvement in the NYSE, he was still receiving privileged inside information relating to AMMO sales, financial results, and future projections. Plaintiff questioned why Defendant Wagenhals was allowing Mr. Larson to sell shares while investor shares were restricted and reminded Wagenhals insider sales should be publicly disclosed through SEC filings.  Defendant Wagenhals stated he would address this issue with Mr. Larson, and he did not believe Mr. Larson would be selling any further shares.

30.    Plaintiff discovered while preparing information for the Board of Directors meeting scheduled in May 2019, that contrary to what Defendant Wagenhals told her in

February, Mr. Larson was continuing to sell shares in the market, and several of Mr. Larson and Mr. Grdina's stock sales continued to be questionable in terms of their timing. Specifically, the records will reflect shares were sold during blackout or quiet periods and on several occasions tied to significant news relayed in company press releases which Mr. Larson controlled.

**B.      Plaintiff, Defendant Wagenhals, and Mr. Larson Meet With Paul Dorfman of the NYSE Relative to Uplisting AMMO on the NYSE and Mr. Larson Subsequently Creates a Hostile Work Environment for Plaintiff.**

31.      From March 31-April 3, 2019, Plaintiff, Defendant Wagenhals and Mr. Larson were in New York to attend a microcap conference and meet with the New York Stock Exchange ("NYSE"). Investor presentations are generally provided by the Company's CEO and CFO at investor conferences or summits.  Because AMMO's then CFO was inexperienced at presenting to the investment community, Mr. Larson assumed this public facing role with stock sales and strategic financial transactions.  The team of Defendant Wagenhals, Plaintiff and Mr. Larson presented to potential investors at this conference and also had one-on-one meetings with investors and institutions interested in learning more about AMMO.

32.      During these meetings, Mr. Larson was introduced as the Defendant Wagenhals' "partner" and the Company's Vice President of Finance. Defendant Wagenhals regularly commented that he believed Mr. Larson to be his partner, and if he were not currently engaged in defending himself against an SEC complaint, he would appoint Mr. Larson as the President and CFO of AMMO, Inc. Plaintiff believed Mr. Larson was performing those duties, as the de facto for each, without the official titles in

order to remain under the radar of the SEC, due to his ongoing SEC investigation, and to facilitate his trading and sales of the Company's securities without public scrutiny. Plaintiff also believes Mr. Larson avoided public transparency about his position with AMMO to avoid filing the appropriate SEC documents relating to his transactions, even though by SEC definition he was an "insider" subject to Section 16 compliance.

33.    On April 2, 2019, Plaintiff, Defendant Wagenhals and Mr. Larson met with Paul Dorfman of the NYSE. During this meeting Mr. Dorfman advised them that contrary to Mr. Larson's ongoing statements to Defendant Wagenhals, AMMO executives, and potential investors, AMMO was not yet in the queue for uplisting, nor was this going to occur until the NYSE received all requested information, and the Company had addressed its working capital deficiency. Specifically, AMMO was requested by the NYSE to provide updated projections, financial statements, and an update on its current capital raise and recent acquisition of Jagemann's Brass Casing Division all of which had not yet been submitted or addressed as of the date of the meeting.

34.    This status was significantly different than what Mr. Larson had told Defendant Wagenhals and AMMO executives over the prior three months, resulting in the Company and Mr. Larson falsely communicating the status of the impending uplist to investors and potential investors up to and including those attending meetings with Defendant Wagenhals at the microcap conference the two days prior. According to Mr. Dorfman, AMMO was still in the initial screening process.  When Plaintiff asked about

the timing, Mr. Dorfman told her assuming the Company's application and financial position met with the NYSE's standards, best case would be six to eight weeks.

35.     The Company also learned during this meeting that Mr. Larson had engaged Mr. Grdina to assist with the NYSE uplisting process, knowing Defendant Wagenhals had terminated Mr. Grdina for cause and both Defendant Wagenhals and Plaintiff had serious concerns relating to Mr. Grdina's involvement with the Company given his continued stock sales.  Defendant Wagenhals appeared shocked during the NYSE meeting to learn that Mr. Larson had not been truthful with him throughout the uplisting process and to find that Mr. Grdina was still involved with regulatory entities. It is also important to understand that in order for Mr. Grdina to participate, he was given the Company's confidential financial statements, projections, etc.  Records reflect that throughout the time that Mr. Grdina and Mr. Larson were working to garner NYSE approval, they were also trading in the AMMO securities.

36.     In fact, during the taxi drive to the hotel after the NYSE meeting, Defendant Wagenhals again expressed his anger with Mr. Larson and told Plaintiff he needed to talk with Mr. Larson privately.  Plaintiff had a proposal to prepare, so she offered to stay in her room that afternoon and evening to work, enabling Defendant Wagenhals to talk with Mr. Larson one-on-one. After they parted company in the hotel lobby, Defendant Wagenhals called Plaintiff to express his disgust with Mr. Larson again, saying that once again he had been lied to and Mr.  Larson had betrayed both him and the Company. Plaintiff listened while Defendant Wagenhals vented, and then called

Tod Wagenhals, an executive vice president for the Company, to give him an update on the situation in New York.

37.   On April 3, 2019, Defendant Wagenhals asked Plaintiff to stay engaged with the NYSE.  He specifically asked her to reach out to Mr. Dorfman to understand what information he still needed and to ensure it was provided by the CFO in Mr. Larson's absence as he no longer trusted Mr. Larson to be honest with him about the process and timing.

38.   On April 5, 2019, under the direction of Chris Larson, Rob Wiley, the newly appointed CFO, sent an email and the revised projections to Paul Dorfman, stating he "had cleaned up the projections a little further," as requested.  "We removed all future financings as you mentioned below. Please let us know if you have any questions." However, that was not the case. The pro forma financial statements reflected the debt refinancing as having already taken place, which as of that date, it had not.  According to Rob Wiley, the Company's CFO, preparation of the financial statements was completed under the direction of Mr. Larson.

39.   On April 8, 2019, Defendant Wagenhals and Plaintiff met with Mr. Larson to discuss what happened in New York and what information was provided to Mr. Dorfman. Mr. Larson became agitated with Plaintiff, in particular because she asked about how he could include Mr. Grdina in the NYSE uplisting process.  She also asked how Mr. Larson planned to respond to the working capital questions Mr. Dorfman was asking, given AMMO's refinancing/restructure was not completed, nor did they have an extension on the debt incurred through a recent AMMO acquisition.   Mr. Larson

responded by telling Plaintiff if she wanted to "fucking handle it, then go ahead." Defendant Wagenhals advised Plaintiff that he was going to have Mr. Larson continue to work with Mr. Wiley to answer the questions asked and provide all necessary financial information and he would remain involved ensuring its accuracy and timeliness.

40.     After reviewing the revised projections sent by Mr. Wiley, Mr. Dorfman sent an email to Wiley on April 8, 2019 asking if the AMMO Form 10-K to be filed with the SEC for the year ended March 31, 2019, would reflect the information included in the revised projections.  Mr. Wiley was instructed by Mr. Larson to send the response crafted by him, confirming it would. This was after Mr. Dorfman became aware that Mr. Larson was not the CFO and advised Mr. Larson the NYSE was to correspond directly with the applicant's CFO which he had believed Mr. Larson was until receiving Mr. Wiley's email.

41.     Specifically, the email from Mr. Dorfman stated the following: Question: "Would the $9.9 million acquisition note payable (to Jagemann) be shown as LTL (long term debt).  When does it mature?"  The answer provided for this bullet point was "48 months." Mr. Dorfman then asks: "Will the 3/31/19 10-K filing show approximately these numbers from your excel income statement, balance sheet (meeting the projections as provided):  $8.5 million in cash, 15 million current assets, $54 million in total assets, $14 million in stockholder's equity, $12 million in revenue and $1.0 million in net loss." The response was: "The items identified below will be disclosed in our 10-K. Stockholder equity will be significantly higher".

42.    On April 9, 2019, Plaintiff met with Rob Wiley to obtain a copy of Defendant AMMO's April 8 response to the NYSE.  After reading it, she asked Mr. Wiley directly whether he was comfortable with the response given by AMMO, in particular what Mr. Larson wrote for him to submit. Mr. Wiley said "no" and asked "if he had done something illegal" by sending the knowingly false information.  Plaintiff responded by telling him she did not know whether or not it was illegal, but either way it was misleading and wrong.

43.    On April 10, 2019, Plaintiff met with Defendant Wagenhals to discuss Defendant AMMO's response to the NYSE and asked whether he was aware that AMMO had misrepresented the facts in its response.  Defendant Wagenhals replied "no he had not seen it," so Plaintiff gave him a copy and asked for his opinion.  Defendant Wagenhals told Plaintiff there was no way AMMO would be reporting the sales, net loss or cash position noted in the response to the NYSE.  In fact, as noted in the Company's Form 10-K as filed on July 1, 2019, the net sales were $4.5 million, the net loss was $11.7 million, $8.6 million in current assets and the cash balance was $2.2 million, all significantly lower than stated to the NYSE.

44.    Plaintiff went on to share with Defendant Wagenhals she was deeply concerned about Mr. Larson's lack of judgment in the handling of AMMO's attempt to uplist, the continued misstatements about the uplist status, his prior stock transactions, and now in corresponding inaccurate financial information to a representative of a national exchange. Defendant Wagenhals agreed and told Plaintiff he would address Mr. Larson when he came in. Plaintiff assumed, based upon Defendant Wagenhals'

statements, both that morning and in New York, that Mr. Larson would be properly addressed with formal corrective action, and that the prior misstatements would be corrected. No such action was taken and the clash between Plaintiff and Mr. Larson intensified.

45. On that same date, Mr. Larson came into Plaintiff's office and yelled at her, stating she had no right to talk to anyone about him. Mr. Larson told her that if she had something to say to him, she should "fucking say it to him." He accused Plaintiff of attempting to undermine him - all as a result of Plaintiff talking with Defendant Wagenhals, her direct supervisor that morning. During this discussion Mr. Larson also made reference to things going on within Plaintiff's department that had not yet been discussed with anyone other than the Research and Development team because the Company was still quantifying a timeline. Specifically, Mr. Larson stated that AMMO was delaying its shipment to a military customer due to material issues. Mr. Larson said Plaintiff should focus on managing her own activities, as she was nothing more than a "fucking sales person."

46. After Mr. Larson walked out of her office, Plaintiff waited several minutes before going to Defendant Wagenhals' office where Mr. Larson and Defendant Wagenhals were sitting and discussing the NYSE. She entered and informed Mr. Larson that he would never address her like that again. If Mr. Larson wanted to discuss something, she was there to address it with Defendant Wagenhals present. Their conversation lasted more than an hour with no resolution. Defendant Wagenhals did not

stay in the room the entire time, nor did he address Mr. Larson's behavior.   In fact, Defendant Wagenhals proceeded to take Mr. Larson to lunch, as if nothing had happened.

47.   Later that day, Plaintiff asked Defendant Wagenhals whether the Company had updated its response to the NYSE. He told her after talking with Mr. Larson and Mr. Wiley, Defendant Wagenhals was comfortable with what was submitted and so were they.  It is important to note that although the Company did up-list to a national exchange in December of 2020 (almost 2 years after meeting with Mr. Dorfman), but it was not the NYSE.  It is also important to highlight that as previously noted the May 2019 10-K filing referenced by Mr. Dorfman in his April 8, 2019 email to the Company did not reflect the financial position presented by AMMO's Management in early April.

**C.   Plaintiff's Email is Compromised.**

48.   On April 11, 2019, Plaintiff contacted Security Operations Group International, LLC ("SOGI"), her military sales team, and expressed a concern that her computer and email may have been compromised. She came to this conclusion based upon Mr. Larson's comments the prior day and his knowledge of her confidential discussions with her Team. This was a concern because Plaintiff was working with SOGI to obtain a security clearance, enabling her to work with them on special projects for the United States Department of Defense ("DOD").  She had advised IT and the executive management of this effort and the requirement for her email to be secure.

49.   Plaintiff was told by SOGI there was a very easy way to detect whether her computer was compromised.  They would simply send a test email to verify whether the emails were being opened at another IP address.  This test email was sent on April 12,

2019. It was marked "Our Discussions" and referenced a serious matter that required Plaintiff's presence in Washington, D.C. to speak with the NSA. Plaintiff was concerned this compromise could lead Defendant AMMO to lose its potential to secure DOD contracts, jeopardize her security clearance efforts and could be considered the commission of a felony (inappropriate distribution of classified information).

50. On April 15, 2019, Plaintiff was notified that the email was opened by two IP addresses on April 12, 2019. One IP address was hers - the other was within AMMO's internal network. This validated her concerns about being inappropriately monitored and she shut down efforts on her security clearance until she was able to secure her email from unauthorized personnel. Plaintiff also notified Tod Wagenhals that the singular test was run, and that she was concerned about the company's internal security. He agreed with Plaintiff that Messrs. Mooroian, Larson, Flynn and Daddio could not be trusted to not read or monitor her activity and supported her need to secure her email. Plaintiff mentioned that SOGI could come out with equipment to scan the offices and install safeguards. Due to the escalation of events following, no further action was taken.

**D.    Plaintiff is Excluded from Strategic Meetings Involving Her Team.**

51. On April 15-16, 2019, AMMO had meetings with Jagemann Stamping and Jagemann Munition's executives to discuss sales efforts and the manufacturing requirements necessary to support projections given to the Street, the Howell acquisition and other discussions. During these meetings it was evident to attendees there was significant tension between Mr. Larson and Plaintiff, especially after she was "excused"

by Defendant Wagenhals and Mr. Larson from discussions that related to the purchase and installation of equipment required to manufacture the TAC-P, a line of military ammunition being designed and developed by Plaintiff's direct reports specifically for sale within her assigned territory.

52.     This request was unprecedented.  Plaintiff was responsible for developing and implementing the Division's strategy and had worked with her team to prepare for the upcoming discussion. In addition to that, although she was dismissed, her team was brought into the meeting room by Mr. Larson. After being dismissed from the meeting, Dan O'Connor, Audit Committee Chairman, followed Plaintiff to her office to ask if she was okay and to inquire about the tension he observed.  She shared with him what happened between April 8-April 10 and that she believed she was being punished and excluded from meetings because of a falling out with Mr. Larson due to her reports to Defendant Wagenhals about Mr. Larson's actions with the NYSE and Mr. Larson's continued stock trading.

**E.     Plaintiff Engaged in Protected Activity When She Reported Her Discoveries of Illegal Stock Transactions by Defendant AMMO Executives to AMMO Audit Committee Chairman, Dan O'Connor and Is Granted Whistleblower Protection.**

53.     On April 17, 2019, Plaintiff received a call from Dan O'Connor who shared with her the outcome of a meeting that he, Mr. Larson, Defendant Wagenhals and Mr. Wiley had relating to the Company's internal controls and governance. (Historically, Plaintiff was a participant in similar meetings, and Mr. O'Connor found it odd she was absent.)  Mr.  O'Connor was rightfully frustrated, because Mr. Larson continued to deny

Defendant AMMO's responsibility to hold itself to a higher public company standard. Mr. O'Connor also mentioned to Plaintiff that Mr. Larson was again disrespectful to him in his answers.  Mr. O'Connor asked Plaintiff whether based on her experience she believed the Company had sufficient internal controls and she replied, "No".  This was based upon her observations that the Company's controls pertaining to the issuance and control of its common stock were weak and had allowed questionable transactions to occur without oversight.

54.     It was Plaintiff's good faith belief that several employees involved in share issuance had either used those loopholes to transact sales or disregarded the SEC regulations entirely.  Mr. O'Connor then asked if she was aware of stock sales for employees and she said yes, she had seen them on the transfer agent documentation and she had reported all of this to Defendant Wagenhals on several occasions assuming he, assisted by the CFO, would take action to remedy and report.

55.     After recognizing that Defendant Wagenhals had no intention of addressing the concerns raised by Plaintiff, on April 24, 2019, following the internal guidance provided by the Company's governance policies, and because the hostility toward her by Mr. Larson was escalating, Plaintiff reached out to the Audit Committee Chair, Mr. O'Connor, to schedule a call to discuss her concerns.  They scheduled a call for later than evening. During this call, and in the weeks following, Plaintiff shared with Mr. O'Connor her concerns about Mr. Larson, the lack of controls on the Company stock, the unauthorized lifting of the restrictions without Board or shareholder notice, her recent treatment by both Defendant Wagenhals and Mr. Larson, and the series of events over the

last couple of months. At this time, Mr. O'Connor stated for the record, that Plaintiff was covered under the Whistleblower Protections offered by the SEC.

56.     Plaintiff shared with Mr. O'Connor that she felt like this protection began with her November conversation with Defendant Wagenhals about the potential insider trading and had been ongoing in their discussions. She told Mr. O'Connor during this call she was going to revise the original spreadsheet provided to Defendant Wagenhals relating to Mr. Larson and Mr. Grdina's stock sales to include AMMO press releases, SEC filings, etc. and provide it to Mr. O'Connor for his review.  She wanted to be sure during his informal review of the Company's financial records, Mr. O'Connor could analyze these transactions and provide guidance to the Board of Directors for remedial action.

57.     During the April 24, 2019 telephone call with Mr. O'Connor, Plaintiff also expressed that her interactions with Mr. Larson and Defendant Wagenhals were becoming more uncomfortable and she wanted to be sure the Board had the information she had assembled and could properly investigate the issues to protect itself as well as the shareholders. They also discussed the requirement for the Board to ensure proper self-reporting measures with the SEC were taken.

58.     On April 24, 2019, Tod Wagenhals came to see Plaintiff, and told her that Adrian Dare, a former employee, had reached out to Defendant Wagenhals expressing concerns about insider trading and the impact of the sales on the value of his and other investors' stock.  Tod Wagenhals then handed Plaintiff a copy of the email received from Mr. Dare.  On information and belief, the Company responded denying any sales took

place when it absolutely knew both Mr. Larson and Mr. Grdina among others had, in fact, sold stock during black-out periods and without proper disclosure, and reminded Mr. Dare of his confidentiality obligations under the terms of his separation agreement. Tod Wagenhals expressed his frustration that no action was being taken by his father to remove Messrs. Larson, Daddio, Flynn, or Mooroian and that he had several friends invested in the Company who could all be in jeopardy based upon the actions of this small group of employees.

59.    On April 29, 2019, CFO Rob Wiley came to Plaintiff and told her Dan O'Connor had requested information from him and showed her the list of reports and files requested.  Mr. Wiley asked for her opinion on how to handle this and whether he should first discuss this with Mr. Larson or Defendant Wagenhals. Plaintiff told Mr. Wiley it was her opinion he should provide anything asked by a Board member, especially the Audit Committee Chairman, but that it was up to him to determine how to approach the request with Defendant Wagenhals and Mr. Larson. Mr. Wiley shared with Plaintiff that he knew if Mr. Larson found out, he would be angry.

60.    Plaintiff reminded Mr. Wiley his primary fiduciary duty was to protect and serve the shareholders and told him she would provide all requested documentation immediately but left him to decide how to proceed.  The last thing Mr. Wiley said was that he was going to send the information and not say anything to Mr. Larson, fearing discord similar to what he was observing with Plaintiff. On several occasions, Mr. Wiley commented to Plaintiff that he was sorry she was going through difficult times with Mr. Larson and Defendant Wagenhals.

61.     On April 29, 2019 and continuing forward, Plaintiff received several calls from Mr. O'Connor requesting explanations or input on several of the items he received from Mr. Wiley. This included information pertaining to stock trades, knowledge of the documentation supporting the lifting of the stock restrictions for certain insiders, requests for information on shares issued to insiders or officers, whether or not Plaintiff was aware of Mr. Larson's lawsuit brought by the SEC investigation, activities relating to Jagemann's acquisition, and the Company's public statements.  Mr. O'Connor also asked her point blank whether she believed any activity existed that could be considered insider trading.

62.     Plaintiff informed Mr. O'Connor of the facts alleged as outlined in this Complaint.  She also told him she believed Mr. Larson was now working to discredit her with Defendant Wagenhals and was intentionally working around her with her employees and assigned functions in an effort to have her removed from her responsibilities, and force her out of the Company entirely.  Mr. O'Connor asked her if she had reported any of this to Defendant Wagenhals. Plaintiff responded that she had discussed all of the information with Defendant Wagenhals, with no action on his part taken.  Mr. O'Connor then asked whether disciplinary action was taken with Mr. Larson or Mr. Grdina.  She informed Mr. O'Connor that Mr. Grdina had been terminated in December of 2018, but she had no specific knowledge of any action taken with Mr. Larson. Mr. O'Connor asked why she believed only Mr. Grdina was addressed, to which she responded the stock sale

issues were secondary to his not being able to work for AMMO, Inc. or enter the facility due to a prior felony conviction.[3]

63.    During one of many conversations, Mr. O'Connor told Plaintiff there was no reason for concern in her sharing any of this information with him, as it would be covered under the Whistle Blower regulations, as well as the Company's own internal policies.   At that point, she told Mr. O'Connor her understanding that Whistle Blower regulations also extended to conversations she had with Defendant Wagenhals as the Chairman and CEO relating to Mr. Larson and Mr. Grdina on prior occasions.   Mr. O'Connor agreed.

### F.    The Hostile Work Environment Intensifies.

64.    By early May 2019, tensions were elevating between Defendant Wagenhals, Mr. Larson and Mr. O'Connor due to Mr. O'Connor's continued requests for information and his position that the Company's internal controls were inadequate. Defendant Wagenhals came into Plaintiff's office on or about May 2, 2019 frustrated, telling her that Mr. O'Connor was demanding information and said Mr. O'Connor would be preparing a memorandum to the full Board to include recent transactions.  Defendant Wagenhals commented the Company did not need this type of problem right now, as it had to ensure its SEC filings on Forms 8-K, 10-K and S-1/A were all filed timely to ensure they could continue to raise much needed capital, and regain shareholder trust.

---

[3] Defendant AMMO, Inc. holds a Class 10 Federal Firearms License that prohibits the Company from employing anyone with a prior felony conviction, unless that individual's rights have been fully reinstated.

65.     Plaintiff expressed to Defendant Wagenhals that Mr. O'Connor was doing his job as the Audit Committee Chair and was within his assigned duties and responsibilities to investigate and report any concerns relating to the Company's internal financial controls as they pertained to protecting the shareholders and relating to the Company's public reporting. Plaintiff asked if Defendant Wagenhals wanted her to contact Mr. O'Connor to discuss the targeted filing schedule for May 31, 2019, and to determine what if anything he would need to support the effort.  Defendant Wagenhals said yes, and asked Plaintiff to ensure Mr. O'Connor was committed to the timely filings.

66.     During this conversation, Plaintiff also told Defendant Wagenhals the Company had missed its payment commitments to Jagemann and the communication between AMMO and Jagemann had neither been transparent or timely according to her discussions and email correspondence with Ralph Hardt, President of Jagemann Stamping. She also advised  Defendant Wagenhals that based on the information relayed to the NYSE by Mr. Larson and Mr. Wiley, the extension of the outstanding note payable to Jagemann was now critical.  Plaintiff noted that without the extension presented in the pro forma statements, the Company would not have sufficient working capital, and risked being issued a "going concern opinion" by the auditing firm.  If this occurred, it was questionable whether they would be approved for trading on the NYSE.   She told Defendant Wagenhals she hoped Mr. Larson and John Flynn, General Counsel, had been able to negotiate the extension before the May 31, 2019 filing date to avoid further issues relating to the accuracy of the Company's application submittal to the NYSE in April. Defendant Wagenhals agreed.

67.     On May 3, 2019, Plaintiff called Mr. O'Connor and talked with him about the current status of the financial audit of Jagemann, as well as the Form 8-K and S-1/A filings in process as instructed by Defendant Wagenhals.   During this discussion, Mr. O'Connor asked her about the Jagemann payments due by April 30, 2019.   She told him it was her understanding the Company was able to secure most of the required payment due, but according to information Tod Wagenhals shared with her, Mr. Larson had advanced Defendant AMMO the remaining $375,000 required to meet the terms of the Note. Plaintiff and Mr. O'Connor discussed the fact that this advance was not approved by the Board as is required for all debt encumbrances.   Mr. O'Connor advised the more appropriate action by Mr. Larson and Mr. Flynn would have been to request an extension from Tom Jagemann, providing additional time for raising capital through the current stock offering.

68.     During the call, Mr. O'Connor also noted that Mr. Larson's note to the Company to cover the shortfall due was a related-party transaction by virtue of both Mr. Larson's stock holdings and his position as an executive within the organization; something that would require additional SEC disclosure, also triggering the necessity for Board approval. Mr. O'Connor said he intended to contact Mr. Flynn and Mr. Larson regarding the related-party note, and he was preparing a memorandum for the Board and Defendant Wagenhals.   Mr. O'Connor stated he wanted to be sure all directors were aware of the concerns he found in his review of the Company's records, and to advise them that related-party transactions like the Note from Mr. Larson, require pre-approval

by the Board of Directors.  Neither Mr. Larson nor Mr. Flynn obtained this approval prior to accepting the funds.

69.    Mr. O'Connor stated he also intended to express in this memorandum his growing concerns relating to the lack of internal controls in place, as well as the blatant disregard by Defendant Wagenhals, Mr. Larson and Mr. Flynn for corporate governance and the oversight role of the Board of Directors. Mr. O'Connor further stressed his discomfort with Mr. Larson and Mr. Flynn's actions and their lack of transparency with the Board.  During the discussion, Mr. O'Connor also asked Plaintiff how she was doing. She commented things were becoming strained now that Mr. Larson, Mr. Flynn and Defendant Wagenhals were aware she was talking with him and that as a result of the tension, she was uncertain about her future with the Company, and operated one day at a time remaining focused on her objectives and team.

70.    On May 6, 2019, Plaintiff told Defendant Wagenhals she had called Mr. O'Connor the previous Friday and that Mr. O'Connor was frustrated because he felt like he was being stonewalled and not receiving the information he requested.  Mr. O'Connor told Plaintiff he was not attempting to create a problem for AMMO, but was genuinely concerned about several issues he felt needed to be addressed by the Board.  Defendant Wagenhals was notably angry that Plaintiff had talked with Mr. O'Connor, asking why she would discuss anything with him. Plaintiff reminded Defendant Wagenhals that Mr. O'Connor was the Audit Committee Chair, was doing his job as the Chair, and that Defendant Wagenhals himself asked her to contact him on May 2, 2019.

**G.  Plaintiff's Objection to Mr. Larson's Inappropriate Draft Press Release Creates Additional Tension.**

71.    On May 8, 2019, Defendant Wagenhals handed Plaintiff a draft press release written by Mr. Larson announcing the State of Arizona Contract recently awarded to AMMO. Plaintiff told Defendant Wagenhals the Company should not be promoting this Contract because it was not guaranteed revenue, something Defendant Wagenhals and Plaintiff discussed in mid-April after receiving notification from the State of Arizona. Defendant AMMO had only been approved as an ammunition supply source (low margin practice rounds only) for Arizona State agencies. The Company would have to go out to each agency covered by the Contract and earn each respective agency's business. Plaintiff also shared with Defendant Wagenhals that once information became public, Plaintiff and Defendant Wagenhals would get called for clarification on how this impacted the Company's financial performance and there was no way the Company could accurately assess or respond to shareholders or potential investors.

72.    On that date, Defendant Wagenhals again agreed with Plaintiff not to promote the Contract in a press release.  In is important to note that following the April exchanges between Mr. Larson and Plaintiff, Mr. Larson was now taking point on press releases for Plaintiff's assigned Division and reaching out to the contacts Plaintiff worked with directly to get information.  Historically, Plaintiff would draft, or participate in the drafting of all press releases updating shareholders on her assigned market, as she was closest to the information, and had significant experience preparing investor communications.  In addition to being removed from the written disclosure process for

her Division, Plaintiff was also no longer asked to participate in calls with prospective investors or meetings with financial institutions, something she had been involved with from late August of 2018 until early April 2019.   It is her belief this was done in retaliation, as well as to prevent her from hearing the information relayed to investors and shareholders.

73.   On May 9, 2019, Plaintiff was once again approached by Defendant Wagenhals regarding a press release relating to the State of Arizona Contract.   She reiterated her concerns to Defendant Wagenhals, but after a lengthy exchange Plaintiff agreed to contact the State of Arizona and obtain consent from the assigned Procurement Officer.   To ensure nothing went out before the Company received approval from the State to disclose the Contract, she contacted AMMO's public relations firm and advised their contact that contrary to what he may have been told, AMMO needed to obtain approval for any form of a press release relating to the Contract and that she had specifically requested that Defendant Wagenhals not file anything until she got back to them.   She told Defendant Wagenhals that if the State of Arizona approved a public notice about the Contract, she would draft a release, based on their discussions, and forward it to him for review before May 13, 2019.

74.   On May 10, 2019, Plaintiff called Bill Loveland, the Procurement Officer for the State of Arizona Contract as she had committed.   She explained that AMMO wanted to issue a press release announcing that it was approved as a supplier for the State. Mr. Loveland immediately asked if she had read the terms and conditions for the

contract, stating it is strictly prohibited, and that Defendant AMMO issuing a public statement would be considered a breach of contract.

75.   Mr. Loveland also commented the incumbents were already voicing frustrations at AMMO's approval and he thought this might put AMMO in serious jeopardy.  Additionally, Mr. Loveland informed her that if the State allowed this activity for one supplier, they would have to authorize and support a press release for each of the other approved suppliers. Mr. Loveland warned Plaintiff against any public statements about the contract. Plaintiff advised Mr. Loveland she would immediately inform AMMO's CEO. Their conversation then focused on opportunities under the current contract that AMMO was qualified for.

76.   After Plaintiff notified Defendant Wagenhals about her discussion with the State of Arizona Procurement Officer, he was openly frustrated the Company could not issue some form of press release, later asking Plaintiff why she had even contacted Mr. Loveland for approval. Defendant Wagenhals added it would have been better to proceed with the press release, and Plaintiff could always tell Mr. Loveland that it was the Company's public relations firm that issued it without her approval. She informed Defendant Wagenhals she would not mislead or lie to Mr. Loveland,  nor would she jeopardize a contract opportunity she had worked so hard to obtain.  The Company did publish a press release on this contract after termination of Plaintiff's employment on July 29, 2019, implying sales under these contracts were imminent.

77.   On May 13, 2019, Defendant Wagenhals handed Plaintiff another version of a press release that was again prepared by Mr. Larson to announce the Company had

been awarded "several" law enforcement contracts.  At that time, only two contracts were in place.  One contract was with the State of Arizona, and another with Pinal County, Arizona. Neither of these contracts had generated any sales as of this date, but Plaintiff and her Team were working to secure future orders through formal proposals to the covered agencies.

78.     Plaintiff also was notified by AMMO's law enforcement lobbyist that he was asked by Mr. Larson to obtain quotes for the new press release. When Defendant Wagenhals handed the press release to Plaintiff, she reiterated her concerns but told him she would ask Mr. Loveland whether this version would be considered a breach of the contract.  She did call and email the Procurement Officer, but he did not respond, which she took as his warning.  This was confirmed on a subsequent call with Mr. Loveland the following week when he told Plaintiff he was glad the Company did not go through with a public statement relating to the contract.

79.     On May 14, 2019, Plaintiff informed Defendant Wagenhals the Company could not put anything out and he was angry. Defendant Wagenhals said he was under tremendous pressure from the investors on the current stock price given the Company was attempting to raise capital through the sale of its securities, and he needed to be able to talk about her Division's sales efforts and recent success in being named an ammunition supplier for State agencies. She told him she understood his position but putting anything out publicly was a risk. Plaintiff also reminded Defendant Wagenhals that the investor presentations given and posted on the Company's website, showed sales coming from Jagemann's brass casing division and commercial sales.  She explained the

investors she spoke with understood the sales cycle for government and military sales and were not expecting significant revenue from her division until late 2019 – early 2020.

**H.    Defendant Wagenhals Asks Plaintiff to Resign from the Board of Directors as a Result of Her Continuing Protected Activity and Plaintiff Refuses to Resign.**

80.    For the remainder of May 14, 2019, and for the days that followed, Plaintiff was removed from discussions relating to press releases and isolated from information pertaining to the company's operations. On that same day, Defendant Wagenhals came to Plaintiff and suggested she may want to resign from the Board.  He said this would eliminate risk if she did not trust the management (meaning himself, Larson and John Flynn) and it would enable her to focus on sales.

81.    Plaintiff asked Defendant Wagenhals why he would suggest this, and why now. She believed and voiced to Defendant Wagenhals that given their disagreements over the NYSE and how that was handled, the number of disagreements about public statements, and her reporting insider trading, she was being punished. Defendant Wagenhals explained that because Plaintiff seemed concerned about how the Company was being managed, this would allow her to eliminate her risk as a Director and just focus on sales.

82.    Defendant Wagenhals also told Plaintiff he did not think she could do both jobs.  Plaintiff asked Wagenhals "what changed" and told him she had always had a full-time job and served as a Director, and that the time she spent on Board related issues was minimal.  Defendant Wagenhals knew she was more than capable of supporting multiple roles, given his own direction that she not only fulfill her own responsibilities, but also

those covered by Mr. Larson and others to cover absences and support key transactions while also serving as a Director.  Plaintiff made it clear to Defendant Wagenhals she had no interest in resigning from the Board, and that they agreed when she accepted employment, she would continue to serve on the Board.  Defendant Wagenhals let it drop at that time.

83.    On that same day, Tod Wagenhals came to see Plaintiff and told her that there had been discussion between Defendant Wagenhals, Tod Wagenhals, Mr. Larson and Mr. Flynn that maybe Plaintiff should resign from the Board.  She informed Tod Wagenhals she expected this from Mr. Larson given his comments on April 10 about her being nothing but a "fucking salesperson" discounting her value and role on the Board of Directors. She also reminded Mr. Wagenhals that Messrs. Larson and Grdina had tried to remove her once before, following a disagreement, citing bylaw restrictions that did not exist.  Plaintiff found a typed resignation letter for her on the Company's fax machine which was immediately taken to Defendant Wagenhals, and the matter was dropped. Tod Wagenhals said he told the three that he knew if Plaintiff was asked to resign from the Board because of lack of faith in the leadership, Plaintiff would also most likely resign from the Company. Tod Wagenhals told Mr. Larson during this discussion that he owed Plaintiff an apology for his inappropriate outburst several weeks back when Mr. Larson came into Plaintiff's office and yelled profanities at her.  Mr. Larson was unaware that anyone had witnessed the confrontation, or that Tod Wagenhals had informed Plaintiff on April 11, 2019, he had overheard the entire event.

84.     On May 15, 2019, Plaintiff had another discussion with Defendant Wagenhals regarding the series of events that had transpired since their trip to New York and his recent request for her to step down from the Board of Directors.  Specifically, she told Defendant Wagenhals a second time that she felt she was being punished by Wagenhals, for standing up to Mr. Larson and for talking with Dan O'Connor, the Company's Audit Committee Chair.  Plaintiff also questioned Defendant Wagenhals as to whether he thought she was a good fit for the organization, given the growing disagreements relating to corporate governance and reporting transparency, coupled with the growing internal isolation she was experiencing.

85.     On that date, Defendant Wagenhals told Plaintiff, as he always had, that he wanted her as part of his team and she was a good fit.  In fact, Defendant Wagenhals went on to commend her on how hard she worked, coming in before most people arrived in the morning and leaving well after the rest of the staff often times taking work home with her at night and on weekends.  He also commented on the value Plaintiff brought to the organization with her Division.

86.     Defendant Wagenhals continued by saying it was clear Plaintiff was uncomfortable with decisions he, Mr. Larson and others were making, and resigning as a Director would reduce her liability for their actions.  When she questioned his logic since she was presented to shareholders as an officer of the Company, Defendant Wagenhals asked her to think about it.  Plaintiff believed after this conversation that Mr. Larson was "untouchable," meaning Defendant Wagenhals had no intention of taking corrective action with him no matter the issue, even though Defendant Wagenhals himself had

commented on several occasions that Mr. Larson was a liability to the Company.  It was also becoming clear to Plaintiff, that Defendant Wagenhals, aided by Messrs. Larson and Flynn, were taking steps to remove her from her prior roles and responsibilities because she would not just "go along" with their actions.

87.    On May 16, 2019, Defendant Wagenhals again came to Plaintiff and suggested she may want to resign from the Board, repeating his same conversation from the day before.  He suggested she talk with her husband and they could sit down on the following Monday (May 20, 2019) to discuss.

88.    On May 17, 2019, with no prior phone call or notice, Plaintiff received an email from Defendant Wagenhals formally requesting that she resign from the Board.

89.    On that same date, Plaintiff received a call from Jose Rojas, her Director of LE Sales, as Plaintiff was working from home.  Mr. Rojas stated that earlier he could hear yelling coming from John Flynn's office between Mr. Flynn and Tod Wagenhals. The two of them had a strained relationship, a discussion Tod Wagenhals had with Plaintiff on several occasions.  Something had caused the tensions to elevate to the point of Mr. Flynn shoving Tod Wagenhals against the wall.  Mr. Rojas said Tod Wagenhals immediately left and it was now quiet.  She asked how the women in the office were doing with this and he said they left not long after.

90.    Later that day, Plaintiff called Tod Wagenhals to check on him. He said he filed a police report against Mr. Flynn but had not yet decided whether to press charges. Tod Wagenhals was furious about what happened (but did not elaborate) and that his father, who was a witness to Mr. Flynn's misconduct, did nothing. Tod Wagenhals also

expressed his frustration that his father continued to allow Mr. Larson and Mr. Flynn's behavior and actions to go unchecked.  He ended the call by saying he was heading out for the weekend.

91.    In light of Mr. Larson's prior aggressive conduct toward Plaintiff and now this physical altercation between other members of the management team, Plaintiff was growing more concerned for her safety. The tension in the office was escalating, she had lost faith that Defendant Wagenhals would take appropriate action to control the office environment or protect her from either Mr. Larson or Mr. Flynn, and she strongly believed with employees approved to carry firearms and weapons in the office, it was not a safe place for her to work until the matter was formally addressed by the Board of Directors.

92.    Plaintiff called Mr. O'Connor and informed him of Defendant Wagenhals' request that she resign from the Board.  She also notified him of the Tod Wagenhals/Flynn's physical altercation in the office, and her concerns about working in the office with his investigation pending.  At this time, Mr. O'Connor advised Plaintiff to work from home given the escalating tensions between she and Mr. Larson, as well as Mr. Flynn until after the Board Meeting on May 29, 2019.

93.    On May 19, 2019, Plaintiff responded to Defendant Wagenhals' email, after taking the entire weekend to prepare it.  She wanted to be sure he understood that did she not believe he was the source of the problem, but his failure to take action to de-escalate the environment was placing her in an extremely volatile situation.  Her hope was that either they could discuss this or that he would utilize the upcoming Board

meeting to discuss the events with the directors in order to find a satisfactory resolution both for her and for the Company. Plaintiff also told Defendant Wagenhals she would honor the Board's decision after presented with the facts she had prepared, even if that included her stepping down as a Director.

**I.     Defendant Wagenhals Orchestrates a Shareholder Vote to Remove Plaintiff as an AMMO Director Which is Publicly Reported in AMMO's Form 8-K Current Report.**

94.     Plaintiff did not receive a response from Defendant Wagenhals to her email dated May 19, 2019 until she sent him a follow up email on May 23, asking for the status of her position both as a Board member and executive.  She did this after a phone call from someone within the Company advising her that a shareholder vote was underway to remove Plaintiff from the Board and that an internal investigation was initiated involving a human resource claim Mr. Larson had filed against Plaintiff. This person highly recommended Plaintiff email Defendant Wagenhals and request to know her status with the Company.  The caller also let Plaintiff know that Mr. Larson had inferred through his comments that he was at war with Plaintiff and intended to take her down, which they both took to mean force her out of the Company entirely.  The caller also noted that Defendant Wagenhals was backing Mr. Larson and he was not sure, in his words, "this would end well" for Plaintiff.

95.     On this same date, Plaintiff received a series of calls from other employees. One of them requested the phone numbers for Board members Plaintiff trusted, as some inappropriate actions were being taken in her absence. Specifically, interviews and conversations were being conducted that accused Plaintiff of a number of issues and they

were certain Mr. Larson was driving the false narrative. Plaintiff provided the employees with both Chief Harry Markley's, Retired, Phoenix Police Department and Mr. O'Connor's contact information.

96.     On May 21, 2019, Mr. O'Connor sent a memorandum to the Board detailing a series of serious issues facing the Company.

**J.    Plaintiff Speaks with AMMO SEC Counsel Jon Cohen and is Told Defendant Wagenhals Wants Plaintiff to Resign as a Director and as President of AMMO's Global Tactical Defense Division.**

97.     On May 23, 2019, after receiving information that Defendant Wagenhals was orchestrating and facilitating a shareholder vote to remove Plaintiff, she called Jon Cohen, SEC counsel for AMMO.  She called Mr. Cohen because she knew if action was pending, he would have to notify her that he was working for the Company and could not discuss anything with her. Mr. Cohen confirmed he could not talk with Plaintiff and their call ended.  Plaintiff then called Mr. O'Connor to inform him of what was happening, and about the calls she received warning her about Mr. Larson and Defendant Wagenhals, as well as the employees seeking a conversation with the Board.

98.     On May 23, 2019, as recommended, Plaintiff sent Defendant Wagenhals an email inquiring as to her status.

99.     On May 23, 2019 at 10:35 p.m., Plaintiff received an email from Defendant Wagenhals.  Throughout the email, Defendant Wagenhals claimed Plaintiff's concerns were not based on fact but were simply her opinions.  However, a review of the documentation will confirm that her concerns were valid and that Mr. Larson and others'

actions were not only potentially violations of SEC laws, but jeopardized shareholders and the Company.

100.   In his email response, Defendant Wagenhals, for the first time, notified Plaintiff that a Human Resources complaint had been filed against her by Mr. Larson on May 9, 2019.   Plaintiff had not been notified of the complaint even though it was standard practice by the Company to notify an employee regarding a complaint immediately, typically within 24 hours. Plaintiff was in the office between May 9, 2019 and May 16 and received no such notification. She was now accused of actions which she knew nothing about, her employees were being questioned, and inappropriate water cooler conversations were occurring in the office accusing Plaintiff of ethical violations and breach of her duties, all of which were damaging to her reputation.   Plaintiff also became aware that some employees, against their stated objections, were being asked to sign the shareholder proxy to remove Plaintiff from her Board seat, being told that Plaintiff needed to focus on sales, inferring she was not performing her duties, and that Defendant would "appreciate" their support.   None of Plaintiff's employees were asked to vote, nor were Board members Mr. Markley and Mr. O'Connor, the people most familiar with Plaintiff's sales efforts. At no time on May 23, 2019, did Defendant Wagenhals notify Plaintiff, verbally or in writing,  that a consent action to remove her from the Board had been had been executed.

101.   On the morning of May 24, 2019, Plaintiff received a telephone call from Jon Cohen, SEC Counsel for the Defendant AMMO.  He said he was asked, authorized by and calling on behalf of Defendant Wagenhals. Before going further, Mr. Cohen asked

if Plaintiff was represented by counsel, because if she was, he could not talk with her. Plaintiff told him she was not currently represented by legal counsel and that she had hoped it would not come to that. Mr. Cohen continued by stating Defendant Wagenhals wanted him to relay the recommendation that she resign from both her position as a Board member, **as well as** her role as the President of the Global Tactical Defense Division. Mr. Cohen continued by saying that taking this action would avoid any further embarrassment or damage to her reputation, and that she could choose the reason disclosed as personal, health related, etc. Plaintiff asked Mr. Cohen why she would resign given her "Whistleblower" status and the hostile actions taken by Defendants leading up to his call. She also inquired what Mr. Cohen meant by "further damage her reputation", to which she received no direct response.

102.    Plaintiff shared with Mr. Cohen that she had been talking directly with a Board member regarding her concerns including potential violations of SEC rules and regulations, after Defendant Wagenhals failed to take corrective action. She also advised Mr. Cohen that she had requested of Defendant Wagenhals the Board discuss all of her findings at the upcoming Board meeting scheduled for the following week to determine next steps. Finally, Plaintiff advised Mr. Cohen that based on his call to her that morning, and actions underway to remove her as a Director, that she considered the actions further retaliation from both Defendant Wagenhals, Mr. Larson and the Company.

103.    Mr. Cohen asked Plaintiff if she wanted to discuss the situation in more detail. In response, Plaintiff shared with him a brief summary of her email to Defendant Wagenhals sent on May 19, 2019. She asked Mr. Cohen why Defendant Wagenhals was

asking for her dual resignations when he had already taken action to remove her from the Board. Mr. Cohen acknowledged Defendant Wagenhals had proceeded with a shareholder action, but to his knowledge had "not yet triggered it", meaning the SEC Form 8-K had not yet been filed announcing her removal from the Board.

104.    Plaintiff believes Defendant Wagenhals used Mr. Cohen to instigate her resignation, using the threat of public embarrassment as a means to force her resignation. Plaintiff ended the call with Mr. Cohen by saying she had unused vacation and was planning to use it while Mr. O'Connor completed his investigation and the Board convened to review his findings. If necessary, she would get back to him then.  Plaintiff immediately called Mr. O'Connor and advised him about the call and notified Defendant Wagenhals that she intended to utilize two weeks of her unused vacation.

105.    On May 24, 2019, Plaintiff sent Defendant Wagenhals and Board members a memorandum outlining the sales and activities of the GTDD since the last Board meeting.  This was in response to a request from Defendant Wagenhals for an update on her activities and to ensure that the Board members were properly updated on the activities of her department.

106.    Between May 24-May 27, 2019, Mr. O'Connor sent a series of emails advising the Board and Jon Cohen that Plaintiff was protected under the Whistleblower regulations, and the continued exchanges were putting all of the directors and officers at risk.  He stated it was apparent to him that Plaintiff was being retaliated against, and that it needed to stop immediately.  Mr. O'Connor also admonished Mr. Cohen for his call to Plaintiff requesting on the Company's behalf that she resign.

107.   On May 28, 2019, Defendant AMMO filed a Form 8-K Current Report publicly announcing Plaintiff's removal from the Board and she also received a copy of the executed shareholder consents from AMMO.

108.   On May 29, 2019, Plaintiff sent an email to Jon Cohen and Dan O'Connor and raised issues concerning the accuracy of the "shareholder vote" to remove her from the Board.  This was done after reviewing the documents sent to her by the Company (received May 28, 2019) and evaluating shares still outstanding for Mr. Grdina and Defendant Wagenhals on the most recent Stock Transfer agent report available to her. Plaintiff believes the shares voted by Mr. Grdina and Mr. Wagenhals to remove her may be significantly greater than the number of shares actually under their respective control – making their ballots potentially fraudulent, and the results of the shareholder action erroneous.

109.   On May 29, 2019, Plaintiff also received a call from Mr. O'Connor, immediately following the Board meeting stating that during the meeting and in a call with the independent members of the Board prior to the Board meeting, that Directors were not aware of Plaintiff's status as a whistleblower.  One Director in particular stated that had he been aware of her status, he and his colleague would not have voted for Plaintiff's removal from the Board.   Without the vote of this one Director, Tom Jagemann, on behalf of Jagemann Stamping, the Shareholder consent would not have passed.  He represented more than 4.7 million shares and later sent a memo in the form of an email to Defendant Wagenhals stating his concerns and requesting Defendant Wagenhals cease any further action against Plaintiff, including her removal from the

Board.  This email was sent to Defendant Wagenhals on May 28, 2019 at approximately 4:30 pm MST, and was read to Defendant on May 29, 2019 in response to a text message Plaintiff sent to Jagemann personnel this same date.

110.   On May 30, 2019, Plaintiff received a call notifying her that Defendant Wagenhals and Mr. Larson had told an AMMO employee that Plaintiff "would not be with us much longer" and instructing him to reach out to her customers.   This was confirmed by  Plaintiff's discussion with one of her key customers.  In light of the events of the past few months, the prior request by Defendant Wagenhals for Plaintiff to resign her Board seat and position as President of GTDD, harassing emails from Mr. Flynn and Defendant Wagenhals, and this latest information from her customer, Plaintiff realized her employment was being terminated. She also learned that Defendant Wagenhals, Chris Larson and John Flynn were attempting to discredit her through misleading allegations to other employees and business contacts while she was out of the office on vacation.

111.   On June 7, 2019, counsel for Plaintiff sent Defendant Wagenhals a letter stating, *inter alia*, that Plaintiff had been constructively discharged as follows:

> Beginning in November 2018 and continuing thereafter, Ms. Hanrahan disclosed to you and the head of AMMO's Audit Committee potential violations of rules or regulations of the Securities and Exchange Commission committed by various members of AMMO's management team.  As a result of these disclosures: (a) she has experienced a continuing hostile work environment about which she repeatedly complained to you; (b) you then began the process to remove her from the AMMO Board of Directors; (c) you instructed attorney Jon Cohen to ask for her resignation from Ammo's Board of Directors and as President of her Division; (d) she was removed as an AMMO director which has and will cause her to sustain monetary and reputational damages; (e) you have essentially removed her from performing many of  her job duties and responsibilities pursuant to her job description which she has dutifully performed since being hired, and (f)

you have undermined her authority as the leading executive of her division. Moreover, AMMO's continuing failure to address these potential violations has created potential liability for her.   Finally, in light of physical altercation which recently occurred in the AMMO workplace involving two members of the management team and her knowledge about the background of another AMMO executive, she has bona fide concerns for her physical safety.   When reviewing the totality of these adverse actions, Ms. Hanrahan considers that she has been constructively discharged from her employment by AMMO effective immediately.

## FIRST CAUSE OF ACTION

### (Retaliation In Violation of the Sarbanes-Oxley Act - 18 USC § 1514A)

112.   Plaintiff complains and realleges all of the allegations contained in this complaint and incorporates them by reference into this cause of action as though fully set forth herein.

113.   At all material times Section 806 of the Sarbanes Oxley Act of 2002 was in effect and binding on Defendants. It prohibits employers such as Defendants from discharging, constructively discharging, demoting, threatening, harassing or in any manner discriminating or retaliating against any employee because he or she provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency, or an internal investigation by the company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders. In addition, an employer may not discharge or in any manner retaliate against employee because he or she filed, caused to be filed, participated in, or assisted in a proceeding relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to

fraud against shareholders. If an employer takes retaliatory action against an employee because he or she engaged in any of these protected activities, the employee can file a complaint with the Secretary, United States Department of Labor, Occupational Safety and Health Administration ("OSHA").

114.    Plaintiff engaged in protected activity under Section 806 of SOX while employed by Defendant AMMO. As alleged herein, while employed in her capacity as an officer and board member, Plaintiff made numerous disclosures over a period of months prior to her removal as a board member and constructive discharge based upon her reasonable belief that Defendant AMMO and its executive officers engaged in conduct that constituted securities fraud, and which conduct violated rules and regulations of the SEC, or potentially fraud against Defendant AMMO's shareholders. Plaintiff's reasonable belief of these violations was formed after Plaintiff became aware that Defendants violated certain rules and regulations of the SEC and that Defendants failed to take prompt and effective remedial action or make appropriate disclosures to the SEC, investors and the public concerning these violations.

115.    Plaintiff reported her concerns about these matters over an extended period of time beginning in November of 2018, extending through her removal from her two positions with Defendant AMMO in May of 2019.  This included discussions with her senior management officials including her direct supervisor Defendant Wagenhals, and Mr.  O'Connor, head of Defendant AMMO's Audit Committee, and others including Defendant Wagenhals' son, Tod Wagenhals, an Executive Vice President for Defendant.  Plaintiff reported concerns about certain stock transactions by members of Defendant's

AMMO's management team including Ricky Mooroian, Dominic Daddio, Christopher Larson and Jay Grdina which she had a reasonable good faith belief violated various SEC rules, laws and regulations including insider trading during the Defendant AMMO's blackout periods. As a result of Defendant AMMO's conduct, Plaintiff reasonably believed that Defendant AMMO failed to fulfill its corporate disclosure/reporting obligations under SEC rules, laws and regulations.

116.   Based upon her decades of experience with publicly traded companies, Plaintiff actually and reasonably believed that the actions listed above violated federal statutes, rules and regulations. Because Defendants were heavily regulated by a number of federal agencies, because Plaintiff reasonably believed that Defendants were committing a fraud on both its shareholders and its regulators, and because Plaintiff reasonably believed that such fraud constituted a violation of federal fraud statutes and regulations, including without limitation, the mail fraud, wire fraud, bank fraud and securities fraud statutes, Plaintiff is entitled to bring her claims here.

117.   Plaintiff timely filed a whistleblower complaint with OSHA, and 180 days have elapsed since filing that complaint.

118.   As a result of Plaintiff's protected activity, Defendants took adverse action against Plaintiff in the form of harassment, expressions of hostility in response to protected disclosures, subjecting Plaintiff to a pattern and practice of harassment, abuse and retaliation over a period of months, and Defendant Wagenhals orchestrated a campaign to demote her from her Board position when she refused to resign, and

subsequently constructively discharged her from her position as the President of the Global Tactical Division of AMMO on June 7, 2019.

119.   Defendants were aware of Plaintiff's protected activity under SOX because Plaintiff raised her concerns and other protected disclosures directly to Defendant AMMO management, including Defendant Wagenhals, Mr. O'Connor, the Audit Committee Chair, who then notified the entire Board of Directors, SEC Counsel and Executive Management that she was protected as a whistleblower.

120.   Plaintiff's protected disclosures under SOX were a contributing factor to the harassment, hostile work environment, demotion and constructive discharge based upon the temporal proximity between her protected activity and the adverse employment actions.

121.   As a direct and proximate result of the alleged violations, Plaintiff has suffered loss of employment, lost wages and benefit, loss of compensation from board appointments, loss of stock, mental and emotional distress, and reputational harm and Plaintiff is entitled to full relief as permitted by Section 806 of SOX to make Plaintiff whole.

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.   For compensatory damages, including lost wages, lost board compensation, the value of lost stock associated with her employment agreement and other employment benefits, according to proof;

2.   For general, mental and emotional distress damages according to proof;

3.    For an award of interest, including prejudgment interest, at the legal rate;

4.    For an award of litigation costs and attorneys' fees as awardable pursuant to SOX; and

5.    For such other and further relief as the court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

Dated this 16th day of February 2022.

**SCHLEIER LAW OFFICES, P.C.**

_____/s/ Tod F. Schleier_____
Tod F. Schleier
Attorneys for Plaintiff Kathleen Hanrahan